UNITED STATES DISTRICT COURT
FOR THE
DISTRICT OF VERMONT

U.S. DISTRICT COURT
DISTRICT OF VERMONT
FILED

2012 SEP 19  PM 3: 13

CLERK
BY_____
DEPUTY CLERK

Frederick Hunter,                    )
                                     )
            Plaintiff,               )
                                     )
      v.                             )          Case No. 5:10-cv-206
                                     )
Town of Shelburne, Shelburne         )
Police Department, Officer Bruce     )
Beuerlein, Officer Casco, Sergeant   )
Fortin,                              )
                                     )
            Defendants.              )

**ORDER GRANTING DEFENDANTS' MOTION FOR SUMMARY JUDGMENT**
(Doc. 60)

In this action brought pursuant to 42 U.S.C. § 1983, Plaintiff Frederick Hunter alleges that in February 2009, officers of the Shelburne, Vermont Police Department wrongfully removed him from his hotel room by use of excessive force, transported him to state court, and restrained him in a chair for several hours. His Amended Complaint asserts violations of his First, Fourth, Eighth, and Fourteenth Amendment rights. Currently before the court is Defendants' motion for summary judgment. Mr. Hunter is representing himself. All Defendants are represented by Nancy Sheahan, Esq.

I.    **Mr. Hunter's Verified Allegations.**

On February 3, 2009, Mr. Hunter checked into the North Star Motel in Shelburne, Vermont. His initial Complaint claims that the following morning, he woke up and took a bath. The Second Amended Complaint alleges that while he was getting dressed, police entered his room, removed his eyeglasses, placed him in handcuffs, and transported him by car to a courthouse in Burlington, Vermont.

Mr. Hunter claims that when he arrived at the courthouse, he was placed in a restraint chair and a bag was put over his head. The Second Amended Complaint alleges that "[t]he restraints wer[e] pulled so tight, blood flow was restricted in Plaintiff's arms

and legs." (Doc. 30 at 5.) Despite crying out for help, Mr. Hunter allegedly remained in the chair for six hours. He claims that medical records from the Vermont State Hospital ("VSH") will show that he was later provided medication for arm and leg pain.

Mr. Hunter's pleadings assert a wide range of legal claims. He first contends that, while at the courthouse, he was denied his First Amendment right to speak with friends and family on the telephone. He further claims that over the course of two years he has been harassed because "is a gay, black, Republican that is going to marry a man and become a minister." *Id.* at 5. He alleges that he has been denied access to reading material, that his legal paperwork was stolen, and that he has been denied the freedom to express his political beliefs.

The Second Amended Complaint also asserts due process violations. Specifically, Mr. Hunter alleges that he was not given notice of his "violations"; was "not allowed to call witnesses when he was arrested"; was not taken before a judge after his arrest; and was not provided adequate process before being taken to the VSH. *Id.* Mr. Hunter further contends that use of the restraint chair violated his rights under the Eighth Amendment; that Defendants violated his Fourth Amendment right to be free from an unreasonable search and seizure; that Defendants failed to read him his *Miranda* rights; and that Defendants both used excessive force and denied him medical care. Finally, he asserts that at his subsequent criminal trial, a video introduced into evidence by the prosecution was "a fake . . . dubbed with the s[c]enery of the North Star Motel." *Id.* at 7.

## II.  Defendants' Statement of Facts.

Defendants in this case are the Town of Shelburne and three Town police officers. They present a different account of Mr. Hunter's arrest and detention. Defendants' filings include the affidavit of Cathy Benway, who was employed as the front desk clerk at the North Star Motel on the morning of February 4, 2009. Ms. Benway attests that while she was working at the front desk, "a man whom I did not recognize [later identified as Mr. Hunter] came into the office and began screaming." (Doc. 60-5 at 2.) Ms. Benway allegedly told the man to leave the office, but he instead came behind the counter, pushed her, and "[a]t one point . . . had [her] pinned to the floor." *Id.* at 3. Ms.

Benway's boyfriend, Winston Matot, arrived at the scene and "was able to pull Mr. Hunter off of [her]." *Id.* Mr. Matot's affidavit states that "Mr. Hunter was extremely belligerent and appeared to be intoxicated." (Doc. 60-6 at 2.)

Ms. Benway subsequently called the police. According to the sworn statement of Officer Bruce Beuerlein, he and Sergeant Fortin were dispatched to the North Star Motel after the police received a report of a guest causing a disturbance in the motel lobby. When they arrived at the scene, a "visibl[y] upset" Ms. Benway described the alleged attack. (Doc. 60-3 at 2.) She then instructed the police that she wanted Mr. Hunter to leave the motel. The police also spoke with Mr. Matot, who corroborated Ms. Benway's account.

The officers proceeded to Mr. Hunter's room, knocked on his door, and allege that they could hear a male voice yelling inside. Mr. Hunter then allegedly opened the curtain of the window next to the door. According to Officer Beuerlein's statement, Mr. Hunter proceeded to yell at the officers "so forcibly that spittle and condensation could be seen forming on the glass. Hunter looked very agitated; his behavior appeared menacing and threatening in nature. He refused directions to open the door." *Id.* As the officers stood by the door, "several guests stepped into the hallway in response to the noise coming from Hunter's room." *Id.*

A third officer, Officer Casco, arrived at the motel, and the officers decided to enter Mr. Hunter's room with a pass key obtained from the front desk "to investigate the assault incident and in order to prevent a continuation of that crime." *Id.* Once in the room, they ordered Mr. Hunter to the floor. Mr. Hunter again refused to comply, and according to Officer Beuerlein, "was still standing between the two beds in the room when he turned and appeared to be going toward some personal belongings located at the head of one bed." *Id.* As a result of this behavior, "a Taser was deployed. The initial impact of the Taser caused Hunter to fall backward to a sitting position on the bed." *Id.*

According to Officer Beuerlein's testimony at Mr. Hunter's criminal trial, the police warned Mr. Hunter three times that the Taser would be used if he did not comply

with their orders. (Doc. 60-4 at 33.)[1]  After the Taser was allegedly deployed, probes from the Taser came dislodged, and Mr. Hunter refused commands to lower himself to the floor.  The officers then decided to take him into physical custody.  *Id.* at 36.

The police testified that Mr. Hunter vigorously resisted their efforts to restrain him.  Mr. Hunter conceded at trial that he had been non-compliant.  *Id.* at 150 ("I do passive resistance training . . . .  I don't get up and walk.  They got to carry me.").  He also testified that he was never tased.

After Mr. Hunter was removed from his room, it was allegedly difficult to place "him into the back of [the police] cruiser.  Again, he continued to resist."  *Id.* at 38.  According to Officer Beuerlein's trial testimony, Mr. Hunter's resistance resulted "in Sergeant Fortin having to go to the opposite side of the cruiser and actually pull Mr. Hunter into the cruiser."  *Id.*   Sergeant Fortin and Officer Casco both testified that, while being placed into the cruiser, Mr. Hunter kicked Officer Casco in the chest.  Once in the cruiser, Mr. Hunter allegedly "started kicking at the door and the back window" such that the police were compelled to remove his shoes and place him in leg restraints.  *Id.* at 98.

Officer Beuerlein and Sergeant Fortin proceeded to transport Mr. Hunter to the Shelburne Police Department, where they allegedly placed him in a holding cell.  Officer Beuerlein's affidavit states that "[d]uring transport, Hunter continued to rant, expelling spittle on several occasions.  While at the Department, Hunter marked the window of the holding cell with spittle."  (Doc. 60-8 at 2.)  Because of the continued spitting, a "spit hood" was allegedly placed loosely over Mr. Hunter's head.  *Id.*  Officer Beuerlein explains that "[a] spit hoot consists of a fabric mesh top with a cloth lower portion that covers the mouth and is designed to prevent the transfer of an arrestee's bodily fluids to the police while allowing the normal exchange of air and breathing."  *Id.* at 3.  The hood

---

[1] Defendants rely upon prior trial testimony in their Statement of Undisputed Material Facts.  It is unclear whether the testimony given at Mr. Hunter's criminal trial is admissible, as it may constitute hearsay, *see* Fed. R. Evid. 801, and the court lacks sufficient information to determine whether an exception applies that would render it admissible.  *See* Fed. R. Evid. 804(b)(1).  At summary judgment, courts may only consider admissible evidence.  *See Raskin v. Wyatt Co.*, 125 F.3d 55, 66 (2d Cir. 1997); Fed. R. Civ. P. 56(c)(4).  Accordingly, the court refers to prior testimony only for the purpose of factual background, and does not rely upon any assertions made in that testimony for purposes of ruling on the legal issues presented by Defendants' summary judgment motion.

is secured by means of straps that extend from the front of the hood, under the detainee's armpits, and through to loops on the back bottom of the hood. Officer Beuerlein avers that, in Mr. Hunter's case, the hood was not tied down.

Officer Beuerlein and Sergeant Fortin subsequently transported Mr. Hunter to the Chittenden County Courthouse in Burlington. During the drive, Mr. Hunter reportedly slid the spit hood off his face and continued to berate the officers. When they arrived at the courthouse, Officers Beuerlein and Fortin transferred custody of Mr. Hunter to the Chittenden County Sheriff's Department (the "Sheriff's Department"). Officer Beuerlein confirms that the Sheriff's Department used a restraint chair to transport Mr. Hunter into the courthouse, but attests that his personal involvement with Mr. Hunter ended once he transferred custody to the Sheriff's Department. The Sheriff's Department later transported Mr. Hunter to the VSH where he was held for thirty days.

Mr. Hunter was charged with resisting arrest and simple assault on a police officer. At trial, a police cruiser dashboard video was introduced into evidence, allegedly depicting portions of Mr. Hunter's arrest and transport. The three police officers involved in the foregoing events testified. Mr. Hunter testified on his own behalf, denied that any assault occurred, and claimed – as he does in this case – that the police entered his room without cause, yelled at him, and handcuffed him. A jury convicted Mr. Hunter on both counts, and the state court sentenced him to a term of six months to two years. The conviction was affirmed on direct appeal. *See State v. Hunter*, 2011 WL 4976638 (Vt. Jan. 27, 2011) (unpublished Entry Order).

### III.   Procedural Background.

Mr. Hunter filed his initial Complaint in this case on August 31, 2010. After Defendant Shelburne Police Department moved to dismiss, Mr. Hunter filed an Amended Complaint naming the Town of Shelburne as an additional Defendant. On May 2, 2011, the court granted the motion to dismiss filed by the Shelburne Police Department and the Town of Shelburne, but granted Mr. Hunter leave to amend his claims against the Town. On June 3, 2011, Mr. Hunter filed his Second Amended Complaint. The Town again

moved to dismiss, and on November 14, 2011, the court granted the motion and dismissed the claims against the Town without prejudice.

Defendants, including the Town, filed the instant motion for summary judgment on December 20, 2011. On January 19, 2012, Mr. Hunter responded with a filing in which he asserted that he was attempting to obtain records from the defense attorney in his criminal case, and that he could not respond to the summary judgment motion until such files were obtained. Accordingly, he requested an enlargement of time in which to oppose the summary judgment motion. The court discussed the enlargement of time at a September 7, 2011 hearing, and summarized the discussion in a recent Order as follows:

> Mr. Hunter explained at the hearing that he is trying to obtain relevant medical records, as well as legal files currently in the possession of his former criminal defense attorney, Jasdeep Pannu, Esq. The court asked counsel for Defendants to certify whether Defendants are in possession of any of Mr. Hunter's medical records, and counsel for Defendants offered to assist Mr. Hunter with drafting appropriate releases.

> Defendants sent a certification to Mr. Hunter on September 15, 2011. (Doc. 48.) Defendants have also produced medical records received from the [VSH] and the Vermont Department of Corrections. (Docs. 65-3, 65-4.) Mr. Hunter now asserts that he never received releases from Defendants' counsel, and that in addition to a release for Attorney Pannu's records, he requires releases for medical records from the Veterans Administration and Baptist Hospital. (Doc. 57.)

(Doc. 68 at 7.)

Defendants did not oppose the motion for enlargement of time, but suggested that there had been a "misunderstanding" as to their obligation to provide Mr. Hunter with a release. (Doc. 65 at 1.) On May 14, 2012, the court allowed Mr. Hunter "additional time in which to obtain the required documentation and respond to Defendants' summary judgment motion." (Doc. 68 at 7.) The court further "invited," but did not require, Defendants' counsel to assist Mr. Hunter with drafting releases "so that the parties may readily obtain all discoverable medical and legal documents." *Id.* The court ordered Mr. Hunter to respond to the pending summary judgment motion on or before June 29, 2012. *Id.* at 8. Over sixty days have passed since that deadline expired, and the court has not

received a summary judgment opposition from Mr. Hunter, a statement of disputed facts, or a request for a further enlargement of time.

## IV.   Conclusions of Law and Analysis.

### A.   Summary Judgment Standard.

On a motion for summary judgment the court must construe the properly disputed facts in the light most favorable to the non-moving party, *see Scott v. Harris*, 550 U.S. 372, 378 (2007), and may grant summary judgment only where "there is no genuine issue as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see O'Hara v. Nat'l Union Fire Ins. Co. of Pittsburgh, PA*, 642 F.3d 110, 116 (2d Cir. 2011) ("Summary judgment is appropriate only if, after drawing all permissible factual inferences in favor of the non-moving party, there is no genuine issue of material fact and the moving party is entitled to judgment as a matter of law."). The moving party bears the burden of demonstrating that no genuine issue exists as to any material fact, *see Celotex Corp. v. Catrett*, 477 U.S. 317, 323-25 (1986), and the court must resolve all ambiguities and draw all inferences in favor of the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Holcomb v. Iona Coll.*, 521 F.3d 130, 137 (2d Cir. 2008).

Mr. Hunter has not opposed the merits of Defendants' summary judgment motion. Even though the motion has not been opposed, the court may not grant summary judgment unless it determines, given the record before it, that Defendants are entitled to judgment as a matter of law. *See Vermont Teddy Bear Co. v. 1-800 Beargram Co.*, 373 F.3d 241, 242 (2d Cir. 2004); *see also D.H. Blair & Co., Inc. v. Gottdiener*, 462 F.3d 95, 110 (2d Cir. 2006) ("Even unopposed motions for summary judgment must fail where the undisputed facts fail to show that the moving party is entitled to judgment as a matter of law.") (internal quotation marks omitted).

### B.   The Scope of Plaintiff's Constitutional Claims.

Although the Second Amended Complaint sets forth a wide range of constitutional claims, Defendants contend they were involved in only some of the events alleged in Mr. Hunter's pleadings. It is undisputed that Sergeant Fortin and Officers Beuerlein and

Casco were personally involved in Mr. Hunter's arrest at the North Star Motel.  Officer Casco attests that he returned to other duties once Mr. Hunter was secured in the patrol car.  Officer Beuerlein and Sergeant Fortin transported Mr. Hunter to the Shelburne Police Department, and then to the courthouse.  According to Defendants, the Sheriff's Department took control of Mr. Hunter once he arrived at the courthouse, and it was there that he was allegedly placed in a restraint chair.

Where a non-movant fails to respond to a motion for summary judgment, a district court has no duty to perform an independent review of the factual record to find proof of a factual dispute.  *See Amnesty Am. v. Town of W. Hartford*, 288 F.3d 467, 470 (2d Cir. 2002).  Here, however, in an abundance of caution, the court will review the entire record.  Part of that record is Mr. Hunter's verified Second Amended Complaint.  *See Patterson v. Cnty. of Oneida, N.Y.*, 375 F.3d 206, 219 (2d Cir. 2004) ("a verified pleading . . . has the effect of an affidavit and may be relied upon to oppose summary judgment").

The Second Amended Complaint alleges that certain events took place – such as Mr. Hunter's placement in a restraint chair for several hours – without specifically identifying the Shelburne Police officers as those responsible for the infringement upon Mr. Hunter's freedom of movement.  Although a verified complaint may be treated as an affidavit for summary judgment purposes, its assertions must go beyond vague and conclusory claims.  *See* Fed. R. Civ. P. 56(e) (requiring that non-movant "set forth specific facts showing that there is a genuine issue for trial"); *Patterson*, 375 F.3d at 219 ("Nor is a genuine issue created merely by the presentation of assertions [in an affidavit] that are conclusory."); *Applegate v. Top Assoc., Inc.*, 425 F.2d 92, 97 (2d Cir. 1970) (stating that the purpose of Rule 56[e] is to "prevent the exchange of affidavits on a motion for summary judgment from degenerating into mere elaboration of conclusory pleadings").  Moreover, even if an affidavit is non-conclusory,

> it may be insufficient to create a factual issue where it possesses the
> following two characteristics: (1) it constitutes almost the sole or exclusive
> basis for a disputed issue of fact in the case (or, expressed differently, it is
> largely unsubstantiated by any other direct evidence); and (2) it is so
> lacking in credibility that, even after drawing all inferences in the light

most favorable to the non-movant, no reasonable jury could find for the non-movant because the testimony is incomplete and/or replete with inconsistencies and improbabilities.

*Cusamano v. Sobek*, 604 F. Supp. 2d 416, 456 (N.D.N.Y. 2009) (citing *Jeffreys v. City of New York*, 426 F.3d 549, 554-55 (2d Cir. 2005)).

Here, Defendants have offered a series of statements and affidavits that are both specific and consistent. One issue of material fact that is clearly asserted by Defendants is that they were not personally involved with Mr. Hunter's custody after he was delivered to the courthouse in Burlington. Contrasting Defendants' statements with Mr. Hunter's vague allegations, the court finds that Defendants' involvement began with Mr. Hunter's arrest and transport, and concluded when the Sheriff's Department took custody of Mr. Hunter at the courthouse. As a result, only the following claims may be deemed to arise out of Defendants' actions or omission: (1) excessive force; (2) unreasonable search and seizure; (3) failure to read *Miranda* rights; and (4) denial of medical care.[2]

## C.    Excessive Force Claim.

Defendants contend that Mr. Hunter's excessive force claim is barred because "it necessarily implies the invalidity of his criminal conviction or sentence." (Doc. 60-1 at 10.) Defendants' argument relies upon the U.S. Supreme Court's holding in *Heck v. Humphrey*, 512 U.S. 477, 486 (1994). In *Heck*, the Court held that a plaintiff in state custody seeking relief under § 1983 for "harm caused by actions whose unlawfulness would render a conviction or sentence invalid . . . must prove" that the conviction has been reversed, expunged, declared invalid, or called into question by a writ of habeas

---

[2] Mr. Hunter alleges that "[t]he Shelburne trained police officers used a CD from a January 16, 2005 traffic stop in Pensacola" that was "dubbed with the s[c]enery of the North Star Motel." (Doc. 30 at 7.) Defendants assert that the video and audio recordings used at Mr. Hunter's trial were from the dashboard video and sound system in a Shelburne Police Department cruiser, and were not altered in any way. (Doc. 60-8 at 3); (Doc. 60-9 at 2-3.) The court also notes that defense counsel did not contest the authenticity of these recordings. (Doc. 60-12 at 2.) Because no reasonable juror could find that the police "dubbed" scenes from the motel onto a video from Mr. Hunter's arrest in Florida, the court grants summary judgment in favor of Defendants on that claim. *See Scott*, 550 U.S. at 380 ("[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment"); *Jeffreys*, 426 F.3d at 555 (holding that district courts can issue summary judgment where "the facts alleged are so contradictory that doubt is cast upon their plausibility").

corpus. *Id.* If a judgment in favor of the plaintiff "would necessarily imply the invalidity of his conviction . . . the complaint must be dismissed." *Id.* at 487. However, if "the district court determines that the plaintiff's action, even if successful, will *not* demonstrate the invalidity of any outstanding criminal judgment against the plaintiff, the action should be allowed to proceed." *Id.*; *see also McKithen v. Brown*, 481 F.3d 89, 102 (2d Cir. 2007) (holding that *Heck* turns on "whether a prisoner's victory in a § 1983 suit would *necessarily demonstrate* the invalidity of his conviction or sentence; that a prisoner's success might be merely helpful or potentially demonstrative of illegal confinement is, under this standard, irrelevant").

Application of the *Heck* doctrine thus "requires the court to examine the relationship between the criminal conviction and each of the plaintiff's civil claims." *Jackson v. Suffolk Cty. Homicide Bureau*, 135 F.3d 254, 257 (2d Cir. 1998). Typically, excessive force claims are not barred by *Heck*, as they often "lack[] the requisite relationship to the conviction." *Id.*; *see, e.g., MacLeod v. Town of Brattleboro*, 2012 WL 1928656, at *4 (D. Vt. May 25, 2012) (holding that excessive force claim would not negate lawfulness of arrest "or negate the unlawfulness of Plaintiff's attempt to resist arrest" and was therefore not barred by *Heck*); *Jeanty v. County of Orange*, 379 F. Supp. 2d 533, 543 (S.D.N.Y. 2005) (a "judgment in favor of plaintiff on his § 1983 [excessive force] action would not establish the invalidity of his conviction for Assault in the Third Degree" under *Heck* ); *Sales v. Barizone*, 2004 WL 2781752, at *13-14 (S.D.N.Y. Dec. 2, 2004) ("[I]t is well established tha[t] an excessive force claim does not usually bear the requisite relationship under *Heck* to mandate its dismissal.") (internal quotations and citations omitted).

Mr. Hunter was convicted of resisting arrest and simple assault on a police officer. Under Vermont law, the offense of resisting arrest is defined as "[a] person who intentionally attempts to prevent a lawful arrest on himself or herself, which is being effected or attempted by a law enforcement officer, when it would reasonably appear that the latter is a law enforcement officer." 13 V.S.A. § 3017. Defendants argue that *Heck* applies to Mr. Hunter's conviction for resisting arrest because "Plaintiff would have to

negate an element of the offense, namely, that his arrest was lawful." (Doc. 60-1 at 12.) The Second Circuit has held, however, that "a lawful arrest . . . may be accompanied by excessive force," and that "the jury's return of a guilty verdict in state court for resisting arrest . . . does not necessarily preclude a subsequent claim of excessive force in federal court." *Sullivan v. Gagnier*, 225 F.3d 161, 166 (2d Cir. 2000).

Defendants also note that in the state court criminal trial, Mr. Hunter's attorney argued self-defense. Specifically, defense counsel argued that the police used excessive force, and that this use of force justified Mr. Hunter's physical response. Defendants contend that in order for this argument to have succeeded, the jury would have had to find that the police did, in fact, use excessive force. Because the argument did not succeed, Defendants argue that the jury rejected Mr. Hunter's claim of excessive force, and that a different conclusion here would invalidate his conviction.

In *Tracy v. Freshwater*, 623 F.3d 90, 100 (2d Cir. 2010), the defendants argued that a civil excessive force claim was collaterally estopped by a prior criminal proceeding. The Second Circuit disagreed, but noted that such an argument could have merit if based upon a different record. Specifically, the Second Circuit noted that while the jury in *Tracy* had not been

> asked to necessarily decide the factual and legal issues underlying [plaintiff's] remaining excessive force claim, we do not foreclose the possibility that a careful review of the criminal trial record would establish otherwise. For example, assertion of a particular affirmative defense or use of a special verdict form might indeed make clear that a criminal jury necessarily decided factual and legal issues such as those remaining in this case.

623 F.3d at 100.

In Mr. Hunter's case, defense counsel argued in his closing that when police "use excessive force is when you are allowed to resist." (Doc. 60-4 at 183.) In rebuttal, the prosecution argued that the use of "force was appropriate for the situation that the police officers were facing at that point." *Id.* at 191. After closing arguments, the judge instructed jurors that "[a] person may use force to resist an arrest only if the police

employ excessive force. Excessive force is force which is greater than that which is objectively reasonable in light of the facts and circumstances confronting the officers." *Id.* at 202.

The trial judge's instruction to the jury echoed the federal standard for an excessive force claim. The Fourth Amendment prohibits the use of excessive force by a police officer in the course of effecting an arrest. *See Graham v. Connor*, 490 U.S. 386, 395 (1989). The test for whether the force used was excessive "'is one of objective reasonableness.'" *Bryant v. City of New York*, 404 F.3d 128, 136 (2d Cir. 2005) (quoting *Graham*, 490 U.S. at 399). Consequently, courts commonly consider the circumstances confronting the officers at the time, including: (1) the nature and severity of the crime leading to the arrest, (2) whether the suspect poses an immediate threat to the safety of the officer or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight. *Graham*, 490 U.S. at 396.

Although it is not clear whether the state court jury considered each of the *Graham* factors, the jury was plainly instructed that excessive force is viewed objectively, and requires an examination of the "facts and circumstances confronting the officers." (Doc. 60-4 at 202.) Accordingly, the court finds that the state court jury addressed the question of excessive force, was instructed regarding the appropriate standard, and decided that the force used by Defendants was not excessive. The question of excessive force has therefore been resolved, and consistent with the Second Circuit's ruling in *Tracy*, it cannot be raised by Mr. Hunter in this case.[3]

Moreover, Mr. Hunter asserted that his resistance to arrest was in self-defense. According to the trial judge's instruction, a successful self-defense/excessive force argument would have resulted in an acquittal on the charge of resisting arrest, and to

---

[3] Federal courts give the same preclusive effect to a state court judgment as that judgment would receive from a court within the state. *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 293 (2005). Here, the requirements for collateral estoppel under Vermont law have been met, as the issue of excessive force was resolved by a final judgment on the merits, there was a full and fair opportunity to litigate the question in the prior action, and it is fair to apply preclusion in this case. *See Lay v. Pettengill*, 38 A.3d 1139, 1148 (Vt. 2011). Furthermore, the Vermont Supreme Court has "recognized that collateral estoppel can apply between criminal and civil cases." *Id.*

accept such an argument now would necessarily invalidate his conviction. *Cf., Hudson v. Hughes*, 98 F.3d 868, 873 (5th Cir. 1996) ("Because self-defense is a justification defense to the crime of battery of an officer, [plaintiff's] claim that [defendants] used excessive force while apprehending him, if proved, necessarily would imply the invalidity of his arrest and conviction for battery of an officer."). Mr. Hunter has not shown that his conviction for resisting arrest has been invalidated or otherwise called into question by the state courts. *See Heck*, 512 U.S. at 486. The court therefore finds that Mr. Hunter's excessive force claim is barred by both *Heck* and claim preclusion, and is therefore DISMISSED.

### D.     Unreasonable Search and Seizure Claim.

Defendants also argue that Mr. Hunter's claim of an unlawful search and seizure fails on the merits for two reasons. First, the officers' entry into Mr. Hunter's hotel room was lawful because the motel had terminated his rental period. And second, the entry into Mr. Hunter's room was justified by probable cause and exigent circumstances.

### 1.     Reasonable Expectation of Privacy.

To prevail on an unreasonable search claim under the Fourth Amendment, a plaintiff must show that he had a legitimate expectation of privacy in the place or item searched. *See Rawlings v. Kentucky*, 448 U.S. 98, 104 (1980). In general, individuals have an expectation of privacy in their hotel rooms. *See Stoner v. California*, 376 U.S. 483, 490 (1964). Nonetheless, the Second Circuit has held that "when a hotel guest's rental period has expired or been lawfully terminated, the guest does not have a legitimate expectation of privacy in the hotel room." *United States v. Rahme*, 813 F.2d 31, 34 (2d Cir. 1987) (citations omitted); *see also United States v. Rambo*, 789 F.2d 1289, 1295-96 (8th Cir. 1986) (no Fourth Amendment protection where guest was asked by police, acting at request of hotel manager, to leave hotel because of his disorderly behavior). Moreover, as the Eighth Circuit Court of Appeals explained, "[d]isruptive, unauthorized conduct in a hotel room invites intervention from management and termination of the rental agreement. Thus, an individual 'cannot assert an expectation of being free from police intrusion upon his solitude and privacy in a place from which he

13

has been justifiably expelled.'" *United States v. Molsbarger*, 551 F.3d 809, 811 (8th Cir. 2009) (quoting *Rambo*, 789 F.2d at 1296).

Here, the officers were informed by the desk clerk that there had been an attack, and that she wanted the attacker to leave. Although Hunter denies the attack, the relevant inquiry under the Fourth Amendment is whether the officers acted reasonably based upon the available objective facts. *See generally Maryland v. Garrison*, 480 U.S. 79, 88 (1987) (search of wrong apartment was not unreasonable given "objective facts available to the officers at the time"); *Scott v. United States*, 436 U.S. 128, 137 (1978) ("[A]lmost without exception in evaluating alleged violations of the Fourth Amendment the Court has first undertaken an objective assessment of an officer's actions in light of the facts and circumstances then known to him."); *see also Hill v. Carroll County, Miss.*, 587 F.3d 230, 240 (5th Cir. 2009) ("[W]hen reviewing a grant of summary judgment in the Fourth Amendment context, after first construing disputed historical facts in favor of the non-movant, the court must then ask how a reasonable officer would have perceived those historical facts.").

There is nothing in the record to suggest that the officers should have doubted the credibility of either Ms. Benway or Mr. Matot. The court therefore finds that the police reasonably believed Mr. Hunter had been justifiably evicted. Correspondingly, the officers reasonably believed their actions were lawful because, based upon the information provided to them, Mr. Hunter no longer had a reasonable expectation of privacy in his motel room. *See, e.g, Rambo*, 789 F.2d at 1296; *Molsbarger,* 551 F.3d at 812 ("Any right Molsbarger had to be free of government intrusion into the room ended when the hotel manager, properly exercising his authority, decided to evict the unruly guests and asked the police to help him do so."); *Young v. Harrison*, 284 F.3d 863, 869 (8th Cir. 2002) (noting that case law made it "painfully clear" that hotel guest who was justifiably evicted did not have expectation of being free from police intrusion). Without a reasonable expectation of privacy, Mr. Hunter was not entitled to Fourth Amendment protection, and the actions of the officers did not violate his rights. Defendants are therefore entitled to summary judgment on Mr. Hunter's Fourth Amendment claim.

###### 2.     Probable Cause and Exigent Circumstances.

In the alternative, Defendants contend that the warrantless entry into Mr. Hunter's room was justified by "probable cause plus exigent circumstances." (Doc. 60-1 at 19.) Assuming a legitimate expectation of privacy, warrantless entries by law enforcement officers into residences, including hotel rooms, are presumptively unreasonable under the Fourth Amendment. *See Payton v. New York*, 445 U.S. 573, 586 (1980); *Stoner*, 376 U.S. at 490. An exception to this presumption is where the officers have probable cause, and exigent circumstances justify entry into the room. *See Kirk v. Louisiana*, 536 U.S. 635, 638 (2002).

"Probable cause to arrest exists when the officers have knowledge or reasonably trustworthy information of facts and circumstances that are sufficient to warrant a person of reasonable caution in the belief that the person to be arrested has committed or is committing a crime." *Weyant v. Okst*, 101 F.3d 845, 852 (2d Cir. 1996); *see also Stevens v. City of New York*, 2012 WL 3000677, at *3 (S.D.N.Y. July 17, 2012). "The question of whether or not probable cause existed may be determinable as a matter of law if there is no dispute as to the pertinent events and the knowledge of the officers." *Weyant*, 101 F.3d at 852. The officers in this case received what they reasonably believed to be two credible reports of an assault, and therefore had probable cause to arrest. *See Curley v. Vill. of Suffern*, 268 F.3d 65, 70 (2d Cir. 2001) ("[w]hen information is received from a putative victim or an eyewitness, probable cause exists unless the circumstances raise doubt as to the person's veracity").

The presence of exigent circumstances presents a closer question. The test to determine exigent circumstances "is an objective one that turns on . . . the totality of circumstances confronting law enforcement agents in the particular case." *See United States v. MacDonald*, 916 F.2d 766, 769 (2d Cir. 1990) (*en banc*). More specifically, the question is whether "'the facts, as they appeared at the moment of entry, would lead a reasonable, experienced officer, to believe that there was an urgent need to render aid or take action.'" *United States v. Simmons*, 661 F.3d 151, 157 (2d Cir. 2011) (quoting

*United States v. Klump*, 536 F.3d 113, 117-18 (2d Cir. 2008)).  The Second Circuit has adopted a list of six factors to determine whether there were exigent circumstances:

> (1) the gravity or violent nature of the offense with which the suspect is to be charged; (2) whether the suspect "is reasonably believed to be armed"; (3) "a clear showing of probable cause . . . to believe that the suspect committed the crime"; (4) "strong reason to believe that the suspect is in the premises being entered"; (5) "a likelihood that the suspect will escape if not swiftly apprehended"; and (6) the peaceful circumstances of the entry.

*United States v. Reed*, 572 F.2d 412, 424 (2d Cir. 1978) (quoting *Dorman v. United States*, 435 F.2d 385, 392-93 (D.C. Cir. 1970)).  The Second Circuit has also "consistently emphasized that [these] factors are intended not as an exhaustive canon, but as an illustrative sampling of the kinds of facts to be taken into account.  Sometimes the presence of a solitary factor suffices, alternatively, a combination of several." *MacDonald*, 916 F.2d at 770.

Here, the officers were presented with a report of a violent offense, coupled with a clear allegation, from both the victim and an eyewitness, that Mr. Hunter had committed the crime.  The police had strong reason to believe that Mr. Hunter was still in his motel room, and that he was likely intoxicated.  They accomplished a peaceful entry by means of a pass key obtained from the front desk, and by taking Mr. Hunter into custody, potentially avoided further harm to Ms. Benway and others at the motel.  *See, e.g., Rambo*, 789 F.2d at 1291 (holding that plaintiff's appearance "gave the officers reasonable grounds to conclude that . . . he [would] continue to engage in conduct similar to that which gave rise to the initial complaint").  There was no suggestion that Mr. Hunter was armed, and it is not clear whether he was likely to escape.  *See Reed*, 572 F.2d at 424.

The ultimate question is whether there was an "urgent need" to take Mr. Hunter into custody before obtaining a warrant.  *See MacDonald*, 916 F.2d at 769; *see also Kentucky v. King*, 131 S. Ct. 1849, 1862 (2011) ("Any warrantless entry based on exigent circumstances must, of course, be supported by genuine exigency."); *Klump*, 536 F.3d at 117-18 ("The core question is whether . . . there was an 'urgent need to render aid or take

16

action.'") (citation omitted).  Here, the police arrived at the motel and were told of an aggressive and possibly intoxicated motel guest who had assaulted the front desk clerk. The guest was still on the premises, and was believed to have gone back to his room immediately prior to the officers' arrival.  In his police report, Officer Beuerlein explained that the police decided to "remove Hunter from the room at the request of the desk clerk and to investigate the assault incident in order to prevent a continuation of the crime." (Doc. 60-3 at 2.)

Viewing the facts in a light most favorable to Mr. Hunter, a rational jury would likely find that the police were justified in entering his room and taking him into immediate custody.  The court need not decide this precise question, however, since even assuming that a rational juror could find in favor of Mr. Hunter on his constitutional claim, Defendants are nonetheless entitled to qualified immunity.  A government official is entitled to qualified immunity "if reasonable officers could disagree as to whether exigent circumstances were present." *Loria v. Gorman*, 306 F.3d 1271, 1287 (2d Cir. 2002) (citing *Koch v. Town of Brattleboro, Vt.*, 287 F.3d 162, 169 (2d Cir. 2002) (holding that a grant of summary judgment based on qualified immunity "was appropriate because the officers reasonably believed that exigent circumstances justified their entry")). Accordingly, the officers are entitled to qualified immunity on the unlawful entry claim if they had a reasonable belief that their entry was justified by exigent circumstances, "even if that belief was mistaken." *Loria*, 306 F.3d at 1282.

More specifically, qualified immunity protects police officers acting in their official capacities from liability for damages "unless their actions violate clearly-established rights of which an objectively reasonable official would have known." *Thomas v. Roach*, 165 F.3d 137, 142 (2d Cir. 1999); *see also Martinez v. Simonetti*, 202 F.3d 625, 633-34 (2d Cir. 2000).  In analyzing claims of qualified immunity, a court must assess: (1) "whether the facts that a plaintiff has . . . shown make out a violation of a constitutional right"; and (2) "whether the right at issue was clearly established at the time of defendant's alleged misconduct." *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)

(citing *Saucier v. Katz*, 533 U.S. 194, 201 (2001)).  The court may address either prong first in light of the circumstances of each case.  *Id.* at 236.

"To be clearly established, a right must be sufficiently clear that every reasonable official would have understood that what he is doing violates that right." *Reichle v. Howards*, 132 S. Ct. 2088, 2093 (2012) (internal quotation marks and brackets omitted). "This 'clearly established' standard protects the balance between vindication of constitutional rights and government officials' effective performance of their duties by ensuring that officials can reasonably anticipate when their conduct may give rise to liability for damages." *Id.* (internal quotation marks and ellipsis omitted).  When determining whether a right is clearly established, this court looks to the law of the Supreme Court and the Second Circuit at the time of the defendant's actions. *Huminski v. Corsones*, 396 F.3d 53, 88 (2d Cir. 2005) (citing *Anderson v. Creighton*, 483 U.S. 635, 640 (1987)).  At summary judgment, a "defendant is entitled to qualified immunity only if he can show that, viewing the evidence in the light most favorable to plaintiff, no reasonable jury could conclude that the defendant acted unreasonably in light of the clearly established law." *Ford v. Moore*, 237 F.3d 156, 162 (2d Cir. 2001).

Here, the court finds that, assuming Mr. Hunter had an expectation of privacy in the motel room notwithstanding his eviction, the officers are entitled to qualified immunity for their entry.  As noted above, the facts presented to the police were that an agitated, violent, and possibly intoxicated man had just fled down the hallway after allegedly assaulting the front desk clerk.  In the words of Officer Beuerlein, entry was required, in part, to "prevent a continuation of the crime." (Doc. 60-3 at 2.)  As Officer Beuerlein's statement suggests, this was not simply a case of the police following a crime suspect to his place of abode with no further threat of immediate harm or violence. Indeed, the Second Circuit has held that while probable cause and the presence of the suspect are "important predicates" to a finding of exigent circumstances, they do not suffice where "the crime involved is minor and there is no apparent potential for violence." *Loria*, 306 F.3d at 1287.  Here, not only was officer safety at issue, but Officer Beuerlein's statement attests that there were additional guests standing outside

Mr. Hunter's room, as well as hotel staff, who could have become targets of his alleged aggressions. (Doc. 60-3 at 2.); *see United States v. Titemore*, 335 F. Supp. 2d 502, 506 (D. Vt. 2004) ("A warrantless entry does not violate the Fourth Amendment if circumstances suggest a threat to the safety of the general public or police officers."). In light of these undisputed facts, and the prevailing case law, no reasonable juror could find that the officers acted unreasonably in light of "clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)). Defendants are therefore entitled to summary judgment on Mr. Hunter's Fourth Amendment claim.[4]

### E.     Failure to Read *Miranda* Warning.

The Amended Complaint alleges that "at no time did the arresting officers read Plaintiff his [*Miranda*] Rights." (Doc. 30 at 4.) To the extent that this allegation is intended to be an affirmative claim for relief, it is barred as a matter of law. It is well settled that a civil claim under 42 U.S.C. § 1983 cannot stand solely on the basis of an alleged failure to administer *Miranda* warnings. *Deshawn E. by Charlotte E. v. Safir*, 156 F.3d 340, 346 (2d Cir. 1998) ("[P]laintiffs cannot base a § 1983 claim solely on a law enforcement officer's failure to administer *Miranda* warnings."); *Neighbour v. Covert*, 68 F.3d 1508, 1510-11 (2d Cir. 1995) ( "[E]ven if we were to assume that [the plaintiff's] *Miranda* rights had been violated, that violation, standing alone, would not form a basis for liability under § 1983."). "*Miranda* warnings are a procedural safeguard rather than a right explicitly stated in the Fifth Amendment. The remedy for a *Miranda* violation is the exclusion from evidence of any ensuing self-incriminating statements[,]" rather than civil liability under § 1983. *Neighbour*, 68 F.3d at 1510 (internal citation omitted). Accordingly, Mr. Hunter was entitled to move for suppression of his statements in a criminal case on the basis of the alleged *Miranda* violation, but that violation creates no

---

[4] Any claim that Defendants were motivated by discriminatory animus due to Mr. Hunter's political views, religious affiliations, or sexual orientation does not enter into the Fourth Amendment's objective reasonableness analysis. *See Graham*, 490 U.S. at 397 ("the question is whether the officers' actions are 'objectively reasonable' in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation") (citing *Scott*, 436 U.S. at 137-39).

basis for liability in a civil case. Defendants are therefore entitled to summary judgment on Mr. Hunter's *Miranda* claim.

### F.     Deliberate Indifference to Mr. Hunter's Medical Needs.

The Second Amended Complaint alleges that "[t]he officers made no attempt to get Plaintiff any medical care; even though, they claim to have used physical force and a tazer." (Doc. 30 at 5.) At the time of the events set forth his pleadings, Mr. Hunter was a pretrial detainee. The Due Process clause of the Fourteenth Amendment dictates that a pretrial detainee may not be punished in a cruel and unusual manner. *Bell v. Wolfish*, 441 U.S. 520, 536-37 (1979). Thus, in the context of a claim regarding the medical needs of a state pretrial detainee, the Due Process Clause of the Fourteenth Amendment "requires no more" than the Eighth Amendment would in the case of a convicted prisoner. *Caiozzo v. Koreman*, 581 F.3d 63, 70 (2d Cir. 2009).

The Eighth Amendment standard requires deliberate indifference to serious medical needs. *See Estelle v. Gamble*, 429 U.S. 97, 104 (1976). In order to succeed on such a claim, a plaintiff must provide evidence of sufficiently harmful acts or omissions, as well as intent to either deny or unreasonably delay access to needed medical care or the wanton infliction of unnecessary pain. *Id.* at 104-06. Thus, there are both subjective and objective components to the deliberate indifference standard. *See Hathaway v. Coughlin*, 37 F.3d 63, 66 (2d Cir. 1994). Objectively, the alleged deprivation must be "sufficiently serious." *Wilson v. Seiter*, 501 U.S. 294, 298 (1991). Subjectively, the defendant must have been actually aware of a substantial risk that the inmate would suffer serious harm as a result of his actions or inactions. *See Salahuddin v. Goord*, 467 F.3d 263, 279-80 (2d Cir. 2006). The fact that an official did not alleviate a significant risk that he should have, but did not perceive does not constitute deliberate indifference. *See Farmer v. Brennan*, 511 U.S. 825, 834, 838 (1994).

In the instant case, Defendants concede that they used physical force, including a Taser. Notwithstanding their admitted use of force, their affidavits state that Mr. Hunter did not have any apparent injuries after his arrest. Nor did he notify them of injuries or request medical care. Mr. Hunter has not countered these assertions of fact.

20

The court has allowed Mr. Hunter an opportunity to collect and present medical evidence of physical harm.  No such records have been submitted.  As a result, the undisputed record fails to show either sufficiently serious harm or deliberate indifference by the officers named in this case.  Defendants are therefore entitled to judgment as a matter of law on Mr. Hunter's deliberate indifference to medical needs claim.

## Conclusion

For the reasons set forth above, Defendants' motion for summary judgment (Doc. 60) is GRANTED and this case is DISMISSED.

SO ORDERED.

Dated at Rutland, in the District of Vermont, this _19th_ day of September, 2012.

Christina Reiss, Chief Judge
United States District Court